```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF MISSOURI
                          EASTERN DIVISION
```

DONALD D. FINK,                  )
                                 )
         Plaintiff,              )
                                 )
     v.                          )     No. 4:08 CV 1554 DJS
                                 )                      DDN
MICHAEL J. ASTRUE,               )
Commissioner of Social Security, )
                                 )
         Defendant.              )

**REPORT AND RECOMMENDATION OF**
**UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Donald D. Fink for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and 1381, et seq., respectively. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition under 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends that the ALJ's decision be affirmed.

**I.   BACKGROUND**

On June 19, 2006, plaintiff applied for disability due to depression, anxiety, lower back problems, and hypothyroidism,[1] alleging an onset date of May 15, 2006. (Tr. 51-55, 106.) He was financially ineligible for supplemental security income (SSI). On June 8, 2007, plaintiff filed an application for SSI, which was expedited, making these concurrent claims. (Tr. 41-42.) Plaintiff's claims were denied, and he requested a hearing before an Administrative Law Judge (ALJ). (Tr. 38.) On March 14, 2008, a hearing was held before an ALJ. On

---

[1]Hypothyroidism is the diminished production of thyroid hormone, leading to thyroid insufficiency, which is characterized by a low metabolic rate, a tendency to gain weight, a strong desire for sleep, and sometimes myxedema, a skin disorder. Stedman's Medical Dictionary 755, 1020 (28th ed. 2006).

March 28, 2008, the ALJ issued an unfavorable decision. (Tr. 6-22.) On May 30, 2008, plaintiff filed a request for review with the Appeals Council. (Tr. 5.) On September 6, 2008, the Appeals Council denied his request for review. (Tr. 2-4.) Thus, the ALJ's decision stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On May 15, 2006, plaintiff was seen in the emergency room of Des Peres Hospital complaining of anxiety, feelings of worthlessness, lack of concentration and sleep. He was observed to be tearful and anxious. He was diagnosed with anxiety and depression and discharged. (Tr. 213-17.)

Plaintiff was seen in the emergency room again the next day, and was observed to be tearful and crying. He was diagnosed with anxiety and depression and prescribed Wellbutrin, an antidepressant. His Ativan, a prescription antidepressant, was modified, and his Prozac, an antidepressant, was discontinued. (Tr. 218-24.)

From May 18 to June 1, 2006, plaintiff was admitted to the Intensive Outpatient program at St. John's Mercy Medical Center for anxiety and depression. He reported difficulty coping with life, particularly with his autistic nine-year-old daughter. He reported making mistakes at work due to inability to concentrate, which had been causing him stress. His Global Assessment of Functioning (GAF)[2] at admission was 45.[3] (Tr 199-211.)

On May 22, 2006, Michael Patterson, D.O., at Patterson Family Practice observed that plaintiff's affect was flat and irritable and he diagnosed anxiety. (Tr. 197.) In a June 7, 2006 note, Dr. Patterson

---

[2] A Global Assessment of Functioning (GAF) is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) (DSM-IV-TR).

[3] A GAF score of 41-50 is defined as serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting), or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR at 34.

again observed that plaintiff's affect was flat. He diagnosed anxiety and bipolar disorder. (Tr. 196.)

On Form SSA-3367, dated June 19, 2006, E. Eschmann, an interviewer for the Social Security Administration (SSA), noted plaintiff had difficulty concentrating and answering. Eschmann wrote that he "was very anxious and nervous, his breathing was rapid, and he seems very nervous." (Tr. 95.)

In an initial assessment at Comtrea Community Treatment, Inc., (Comtrea) on August 2, 2006, Jane Goldenhersh, MS Ed., observed that plaintiff's affect/mood was abnormal and he had a poor self-concept. Ms. Goldenhersh diagnosed major depressive disorder and referred plaintiff for psychiatric evaluation. (Tr. 136-37.)

In a treatment note dated August 28, 2006, Jose DaSilva, M.D., staff psychiatrist at Comtrea, described plaintiff as, "sad, almost tearful, anxious, unable to sleep properly, still mourning his losses and quite listless ("anergic"). History indicates the reasons for shaken self-esteem now shattered by ex-boss's criticism terminating in his dismissal and loss of face in view of his girlfriend." Dr. DaSilva diagnosed recurrent major depression and prescribed Lexapro and Xanax. (Tr. 139-40.)

On September 28, 2006, L. Lynn Mades, Ph.D., performed a consultative examination at the request of the SSA. (Tr. 189-94.) Dr. Mades observed plaintiff appeared quite anxious and agitated, had motor trembling, had a depressed and anxious mood, and his expressed verbal judgment was fair to poor. (Tr. 192.) Dr. Mades diagnosed depressive disorder, generalized anxiety disorder, cannabis abuse, and moderate psychosocial and environmental problems. Plaintiff appeared anxious during the examination.

On November 27, 2006, Dr. DaSilva prescribed Risperdal, used to treat bipolar disorder. (Tr. 145-6.) An X-ray on December 26, 2006 revealed degenerative changes in plaintiff's lumbar spine. (Tr. 123.)

On January 22, 2007, Dr. DaSilva noted plaintiff did not look very happy and seemed tired. He diagnosed agoraphobia. (Tr. 152-53.) On February 19, 2007, Dr. DaSilva prescribed Klonopin, used to treat panic disorder and seizures, and discontinued plaintiff's Xanax. (Tr. 154-55.)

In a mental status evaluation dated April 4, 2007, Thomas J. Nowotny, M.D., noted plaintiff's motor activity was agitated, his affect was tense, and he was unable to correctly spell the word "world" backwards. (Tr. 128.)

In a May 15, 2007 treatment note, Dr. DaSilva noted plaintiff's affect was still somewhat depressed and his mood was sad. (Tr. 163-64.)

On September 17, 2007, Ms. Goldenhersh observed plaintiff appeared depressed and anxious. He was to see a physician for a change in medication. (Tr. 172-73.)

On September 18, 2007, following Dr. DaSilva's retirement, plaintiff began treatment with Peter S. Moran, D.O. Dr. Moran noted plaintiff's main problem seemed to be a lack of motivation. For example, although plaintiff enjoyed boating and fishing, he had not been able to talk himself into doing it even though he has ready access to this activity. Dr. Moran diagnosed recurrent major depression and wanted to rule out bipolar disorder. He prescribed Wellbutrin, and continued plaintiff's Risperdal, Lexapro, and Klonopin. (Tr. 174-75.)

In an October 8, 2007 treatment note, Roberta C. Stock, RN, CS, observed that plaintiff had a blunted and depressed affect, seemed tense and anxious, had negative thought pattern, difficulty restructuring his negative thoughts, and had a somewhat slowed, hesitant speech pattern. (Tr. 178-79.)

In a treatment note dated November 9, 2007, Ms. Stock observed plaintiff had a blunted affect, continued to show some depression, seemed tense and anxious, and continued to have negative thought patterns. Stock diagnosed recurrent major depression and probable bipolar disorder. She assigned a GAF score of 50. (Tr. 180-81.) The same day, Ms. Goldenhersh noted plaintiff reported showering only every three to four days. She recommended he shower more, not only to improve his hygiene, but to increase his motivation to leave the house. (Tr. 182.) Plaintiff reported becoming irritated by everything, including TV, and could not tolerate being around people. (Tr. 183.)

On December 7, 2007, Ms. Stock observed that plaintiff had a blunted affect, seemed depressed and anxious, and that his speech was somewhat slowed. She diagnosed recurrent major depression, probable

bipolar disorder, and a personality disorder. She assigned a GAF score of 50 and increased his Wellbutrin. (Tr. 185-86.)

**Testimony at the hearing**

On March 14, 2008, a hearing was conducted before an ALJ. (Tr. 225-63.) Plaintiff testified that he was born in 1959 and has a high school education. He testified that he worked for five years, until May 2006, at a company that remodeled kitchens and bathrooms. He testified that he was no longer able to do the job as he formerly had due to "mental problems" and poor memory, and that he was "let go" because the boss was not happy with his performance. (Tr. 231-32.)

Plaintiff testified that he also worked for eight years as an assistant manager and salesperson at Hoods, a hardware and building materials supplier, until he was terminated because the company wasn't doing well and would not be able to use him anymore. (Id.) He testified he also worked for Associated Grocers, a grocery supplier, shrink wrapping pallets and physically loading them onto trucks, until the company closed. (Tr. 230-31, 246.) He testified he worked at The Forms Store in the 1980s, where he operated a machine while standing up. (Tr. 246.) He testified he thought he was no longer mentally capable of performing any of his former jobs. (Tr. 247.)

Plaintiff testified he was treated for depression at a 10-day outpatient program in June or July 2006. (Tr. 233.) He testified that he has been treated at Comtrea since then. (Tr. 235.) He testified that his medications sometimes help, but other times do not, and that he "has his days." (Tr. 236.) He testified that he takes Risperdal as a sleep aid, but that it only makes him gain weight. He testified that he sees his doctor once a month and his therapist about once every two to three months. (Tr. 236.)

Plaintiff testified that he lives by himself; that he sees his girlfriend of eleven years (and mother of his nine year-old child) every day; and that she helps with his cooking and cleaning. (Tr. 238, 241.) He testified that some days he feels like he can do things and straighten up, but other days he simply lays in bed; that he and his girlfriend grocery shop in the early morning hours to avoid people; and

-5-

that he gets anxious around others. He testified he has panic attacks, which he described as feeling as if he is closed in or as though people are talking about him, and he must get away from them. (Tr. 238-39.)

He testified that he no longer enjoys doing much; that he has crying spells; and that he does not "have a lot of fun doing anything really." (Tr. 243, 250, 255.) He testified that there are days when he does not "get cleaned up or do anything"; that his case manager attempts to get him to bathe more than every three to four days; and that he does not get dressed every day, i.e., beyond wearing sweat pants. (Tr. 252.) He testified that his girlfriend does most of his household chores, including cooking his meals and laundering his clothes. (Tr. 238, 253.) He testified he has frequent road rage, and therefore rarely drives. (Tr. 239A, 254.)

Vocational Expert

Vocational expert (VE) Jeffrey Magrowski testified at the hearing. (Tr. 257-62.) The VE testified in response to a hypothetical question that assumed a person who was restricted to light work because of back problems, could lift up to 20 pounds occasionally, could lift 10 pounds frequently, and could be on his feet the better part of the day. The hypothetical person had a depressive disorder for which he had some level of control with medication and therapy, and was able to get the symptoms to where he could at least do one or two-step instructions in a low stress environment without a lot of social interaction. The VE testified that, based on the credible functional limitations, a hypothetical person could perform a range of light work such as bagger jobs, some packing jobs, some assembly work, and light cleaning and housekeeping. (Tr. 260-61.)

A second hypothetical assumed more non-exertional limitations. Under the second hypothetical the individual was more limited and had a tremendous loss of motivation; a loss of energy; difficulty getting up on a daily basis, maintaining proper hygiene, and focusing; and who experienced crying spells and occasional anger spells. The VE testified

that he was not aware of any jobs the individual could perform.  (Tr. 261-62.)

### III.  DECISION OF THE ALJ

The ALJ found that plaintiff's severe impairments included a major depressive disorder and a generalized anxiety disorder.  (Tr. 11.)  He found that plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the impairments in the Commissioner's list of disabling impairments.  The ALJ concluded plaintiff has the residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. §§ 404.1567 (b) and 416.967(b), except that he can follow single one and two-step instructions, must be in a low stress environment, and have limited social interactions.  (Tr. 18.) The ALJ found plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not credible to the extent they were inconsistent with his RFC assessment.  (Tr. 19.) The ALJ further found that plaintiff was unable to perform his past relevant work.  (Tr. 21.)  Based on the credible evidence and the testimony of the VE, however, the ALJ determined that plaintiff could perform a significant number of jobs in the national economy, and therefore was not disabled under the Act.  (Tr. 21-22.)

### IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's final decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case

differently. See Kroqmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months. 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942. A five-step regulatory framework is used to determine whether an individual qualifies for disability. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment. Pate-Fires, 564 F.3d 935, 942. If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five. Id. Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his past relevant work (PRW). (Id.) The claimant bears the burden of demonstrating he is no longer able to return to his PRW. Id. If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work. Id.

## V. DISCUSSION

Plaintiff asserts the ALJ erred in (1) failing to properly assess his credibility, specifically, failing to consider the requirements set forth at 20 C.F.R. § 404.1528 and the Polaski factors; and (2) failing to properly consider the testimony of the VE.

### 1. Plaintiff's Credibility

The ALJ determined that plaintiff's allegations were not credible to the extent alleged. The ALJ concluded that plaintiff's allegations were inconsistent with the record as a whole, including the objective

-8-

evidence. The ALJ found that plaintiff's condition improved with treatment; that plaintiff had worked with his allegedly disabling condition; and that no physician had imposed any functional limitations on him. (Tr. 13-17, 19-21.)

Plaintiff argues the ALJ erred in failing to properly assess his credibility. Specifically, he alleges the ALJ erred in the analysis of his social activities and by failing to consider his mental health treatment notes, his lower back problems, his earnings history, and the notes of SSA employee Eschman. He argues that increasing his Wellbutrin meant his other medications were not effective.

The ALJ's consideration of the subjective aspects of plaintiff's complaints comported with the applicable regulations, 20 C.F.R. §§ 404.1529, 416.929 (2008), and the factors set forth in Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984) (ALJ must consider claimant's prior work record, observations by third parties and treating and examining physicians relating to such matters as claimant's daily activities; duration, frequency and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medication; and functional restrictions). See also Russell v. Sullivan, 950 F.2d 542, 545 (8th Cir. 1991) (if an ALJ explicitly discredits a claimant's testimony and gives good reasons for doing so, the court will normally defer to the ALJ's credibility determination). The undersigned concludes the record evidence supports the ALJ's determination that plaintiff was not fully credible.

Plaintiff contends the ALJ did not consider the mental health treatment notes. However, this is contradicted by the ALJ's discussion of the mental health treatment notes plaintiff cites. (Tr. 11-17.) The ALJ considered the treatment notes and findings of the medical personnel, and found that plaintiff's allegations were not supported to the extent alleged, but rather caused mild limitations in plaintiff's activities of daily living; moderate limitations in his social functioning; and moderate limitations in his concentration, persistence, and pace. (Tr. 17.) As such, the ALJ determined that plaintiff's mental impairments were severe. (Tr. 11.) Accordingly, the undersigned concludes the ALJ properly evaluated the medical records in finding that

plaintiff's allegations were not supported to the extent alleged. (Tr. 11-17, 20.) See Forte v. Barnhart, 377 F.3d 892 (8th Cir. 2004) (lack of objective medical evidence is a factor an ALJ may consider). 20 C.F.R. §§ 404.1529(c)(1)-(2); 416.929(c)(1)-(2) (ALJ should look at the medically documented "signs" and findings to determine the intensity and persistence of the symptoms and how they actually affect the person).

Plaintiff also alleges disability caused by lower back problems. (Tr. 106.) The ALJ considered the objective evidence and found it was inconsistent with plaintiff's allegations of a disabling back impairment. (Tr. 14-15, 20.) The record evidence shows that plaintiff's reflexes were equal, his sensations were good, and straight leg raising was negative. (Tr. 14-15, 119.) He could heel and toe walk. (Tr. 14, 119.) Plaintiff's strength was full, and his gait was within normal limits. (Tr. 15, 114, 119.) An MRI revealed a mild diffuse disc bulge, although surgery was not needed. (Tr. 15, 114.) The ALJ's finding is also consistent with plaintiff's performance of substantial gainful activity despite his back impairment. (Tr. 20.)

As to plaintiff's argument that the ALJ did mention his earnings history, the undersigned disagrees. The ALJ discussed plaintiff's earnings history, finding that they were above substantial gainful activity level from 1993 until 2006. (Tr. 11.) Moreover, plaintiff's work history does not support his argument that his complaints are credible. Plaintiff alleged a disabling back problem that began when he was 11 years old, but his performance of substantial gainful activity as an adult undermines this. (Tr. 106.) Moreover, there is no record evidence showing plaintiff's back condition deteriorated. (Tr. 20.)

As to plaintiff's argument that the ALJ erred by not considering the notes made by SSA employee E. Eschman, the undersigned disagrees. The ALJ specifically referenced these notes in his decision. (Tr. 19-20, 95.) Eschmann met with plaintiff on June 19, 2006, a month after his alleged onset date, at which time he noted that plaintiff appeared anxious and very nervous. (Tr. 51, 95.) This is consistent with his GAF assignment of 45 of May 19, 2006. (Tr. 210-11.) It is also before plaintiff began treatment from Dr. DaSilva and his GAF scores improved

from 65 to 70, which indicates "mild" symptoms.[4] (Tr. 154, 156, 159, 163, 165). The undersigned therefore concludes Eschmann's comments were properly considered by the ALJ.

The ALJ found the medical evidence showed plaintiff's impairments were controlled and improved with treatment. (Tr. 14, 20.) See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (if an impairment can be controlled by treatment or medication, it cannot be considered disabling). By the time he was discharged from St. John's Mercy Medical Center, plaintiff reported increased energy and motivation, an absence of crying spells, and increased insight. (Tr. 200.) After starting treatment with Dr. Da Silva, plaintiff's GAF scores ranged from 55 to 60. (Tr. 13-15, 140-41, 145, 149, 152, 193.) By February 2007, plaintiff's GAF scores were 65 to 70 and remained steady while under Dr. Da Silva's care. (Tr. 15, 154, 156, 159, 163, 165.) The record evidence shows that plaintiff's depression and anxiety worsened when he was not compliant with his medications, and that his GAF scores improved with compliance. (Tr. 14, 20, 133, 154, 156, 159, 163, 165.) The ALJ found that the medical records failed to show that the medication was ineffective or resulted in side effects. (Tr. 20.)

The undersigned also rejects plaintiff's argument that adding Wellbutrin to his regimen of Risperdal, Lexapro, and Klonopin meant that the three medications were ineffective. An adjustment in medication does not necessarily mean that medication was ineffective but that it was prescribed at the wrong dosage initially or needed to be adjusted to provide optimum effectiveness.

The undersigned notes the ALJ's finding that no physician who examined plaintiff found limitations consistent with disability nor did any physician impose any restrictions on his activities. (Tr. 20-21.) See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000)(lack of significant restrictions imposed by treating physicians supported ALJ's decision of no disability). In other words, plaintiff presented no

---

[4]A GAF of 61-70 is indicative of some mild symptoms or some difficulty in social, occupational, or school functioning; no more than slight impairment in social, occupational, or school functioning. DSM-IV-TR. at 34.

medical evidence that he was more limited than found by the ALJ in his RFC assessment. (Tr. 18.)

Finally, plaintiff's argument that the ALJ's decision contained inaccuracies is without merit. The ALJ found that plaintiff's mental impairments were severe and imposed limitations on his ability to work. However, the ALJ concluded the credible limitations did not prevent plaintiff from performing a significant number of jobs in the national economy. (Tr. 18-22, 260-61.)

Plaintiff's argument that the ALJ erred in considering his social activities with his girlfriend, daughter, family, and church is also without merit. The ALJ considered these activities, along with plaintiff's reports of panic attacks, in determining that plaintiff's severe impairments limited his social interaction. (Tr. 18.) Rather than improperly considering plaintiff's social interaction and daily activities, the ALJ found that he experienced limitations. The ALJ accounted for those limitations in his RFC. (Tr. 18, 260-61.) Moreover, no medical professional placed more restrictive limitations on plaintiff's activities than the ALJ. See Young v. Apfel, 221 F.3d 1065, 1069 (8th Cir. 2000)(finding it significant that no physician who examined claimant submitted a medical conclusion that claimant was disabled and unable to perform any type of work).

The ALJ found that plaintiff's impairments were not as severe as alleged; that plaintiff's impairments were controlled with treatment; that plaintiff worked with an allegedly disabling impairment; that no physician imposed limitations on his ability to function; and that plaintiff could perform a range of light work. (Tr. 13-17, 19-21.) The undersigned therefore concludes the ALJ properly evaluated the record as a whole.

## 2. **Testimony of the VE**

Plaintiff asserts the ALJ erred in failing to properly consider the VE's testimony addressing more non-exertional limitations. The undersigned disagrees. The VE testified that based on the credible functional limitations, the hypothetical individual could perform bagger jobs, packing jobs, assembly work, and housekeeping. (Tr. 260-61.) The

ALJ relied on the VE's testimony and found that there was a significant number of jobs that plaintiff could perform. (Tr. 21-22.) As such, the ALJ properly found plaintiff not disabled.

As to the ALJ's decision to not adopt the VE's testimony that discussed more non-exertional limitations, the undersigned concludes this was not error.  The ALJ is only required to include the credible limitations in the RFC.  See Tindell v. Barnhart, 444 F.3d 1002, 1007 (8th Cir. 2006) (ALJ included all of claimant's credible limitations in his RFC assessment, and the ALJ's conclusions are supported by substantial evidence in the record).  Plaintiff argues that because substantial evidence supports more non-exertional limitations, this testimony should be adopted. However, plaintiff's argument reverses the issue.  The issue is whether substantial evidence supports the ALJ's decision, not whether other findings could have been made based on the same evidence.  See England v. Astrue, 490 F.3d 1017, 1019 (8th Cir. 2007) (if substantial evidence supports the decision, court will not reverse, even if substantial evidence could have been marshaled in support of a different outcome).  Here, substantial evidence supports the ALJ's finding that plaintiff was restricted to single one and two step instructions, low stress environments, and limited social interaction. Accordingly, the ALJ properly relied on the VE's testimony that accounted for the credible limitations.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have 14 days to file documentary objections to this Report and Recommendation.  The failure to file timely documentary objections may waive the right to appeal issues of fact.

      /S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on January 4, 2010.